**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

EUGENE ANDERSON,                CASE NO. 2:05-cv-1089
                                               JUDGE MARBLEY
          Petitioner,                 MAGISTRATE JUDGE KEMP

v.

THOMAS McBRIDE, Warden,
REGINALD WILKINSON, et al.,

          Respondents.

**ORDER and
REPORT AND RECOMMENDATION**

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  On February 28, 2007, proceedings were stayed pending petitioner's exhaustion of state remedies.  Doc. No. 32.  On September 4, 2007, upon petitioner's notification of exhaustion, proceedings were reactivated.  Doc. No. 35.  This matter now is before the Court on the instant petition, respondent's return of writ and supplemental response(s), petitioner's traverse and supplements to the traverse, and the exhibits of the parties.  Petitioner's unopposed motion to amend claim four "to rest on federal Fourteenth Amendment substantive due process violations," *see Motion to Amend*, hereby is **GRANTED**.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**FACTS and PROCEDURAL HISTORY**

The procedural history of this case is detailed in this Court's prior *Report and Recommendation*, June 16, 2006, Doc. No. 11, but is repeated here.  The Ohio Fourth District

Court of Appeals summarized the facts of this case as follows:

> Eugene R. Anderson appeals his Washington County Court of Common Pleas' convictions and sentences for three counts of pandering obscenity involving a minor, felonies of the second and fourth degrees, in violation of R.C. 2907.321(A)(1), (3) & (5), thirty-six counts of pandering sexually oriented matter involving a minor, felonies of the second and fifth degrees, in violation of R.C. 2907.322(A)(1),(2),(3) & (5), twenty counts of complicity in pandering sexually oriented matter involving a minor, felonies of the second and fifth degrees, in violation of R.C. 2923.03(A)(2) and R.C. 2907.322(A)(1),(2),(3), & (5), fourteen counts of illegal use of a minor in nudity-oriented material, felonies of the second and fifth degrees, in violation of R.C. 2907.323(A)(1) & (3), twenty-eight counts of complicity in illegal use of a minor in nudity-oriented material, felonies of the second and fifth degrees, in violation of R.C. 2923.03(A)(2) and R.C. 2907.323(A)(1) & (3), one count of unauthorized use of a computer, a felony of the fifth degree, in violation of R.C. 2913.04(B), one count of corruption of a minor, a felony of the third degree, in violation of 2907.04(A) and five counts of promoting prostitution, felonies of the second degree, in violation of R.C. 2907.22(A)(3).
>
> ***
>
> Law enforcement officers began investigating Anderson, who lived in West Virginia but worked in Ohio at Marietta College, because of Jay Johnson's statements that criminal activity was ongoing at Marietta College. This investigation led to search warrants for Anderson's residence and work place where officers seized items that included computers and computer media.
>
> Officers arrested Anderson. After the officers explained to him that he was charged with unlawful sexual conduct with a minor, Anderson responded, "Not now, I'm not." Anderson told the officers that his office computer should not have any child pornography on it. However, he said that he did have sexual relationships with young adult males. He admitted that

2

he entertained young male teens in the hope that they would engage in sex with him when they turned 18.

Anderson admitted to having adult pornography on his computer. He said that, figuratively speaking, his robotic arm on his computer would capture pictures from the internet. He said that he would go through the pictures and delete the ones that he did not want. When an officer showed him a couple of pictures of young males that were minors on his computer, he said that those pictures should not be there, that they should have been deleted.

Trained forensic officers and analysts examined the computers and used an EnCase program to look at deleted files. Anderson's work computer had recently accessed a computer identified as "Caleb." Officers discovered that Caleb was a special computer server that only Anderson and a Robert Sandford could access. While officers were investigating the Marietta College Network, they later learned that Sandford was deleting and damaging information on Caleb from computers at Ohio University, which is where Sandford worked. Officers eventually located Caleb at Marietta College and disabled and seized it.

At B.C.I., the forensic officers continued to use EnCase and other methods to image or copy the computer hard drives, storage devices, and Caleb to recover deleted data. They found images of child pornography and evidence that Anderson used and maintained Caleb as a hidden server to store pictures, which included images of child pornography. These images depicted juveniles that were nude or engaged in sexual activity.

The computer examiners also found close to 8,000 internet relay chat transcripts. One officer identified chats that Anderson had with young men that he had transported from West Virginia to Marietta College so that they could engage in sexual activity. This officer further found evidence in the chat logs where Anderson admitted paying these young men for

3

sexual activity when they were under the age of 18. Anderson talked about his vast collection of pornographic pictures and described as "more taboo" pictures that depicted sex between older men and boys. The chat logs further showed that Anderson used Caleb and helped Sandford set up and maintain it at Marietta College. In the chat logs, Anderson repeatedly identified himself, his position, his e-mail address and telephone numbers.

Investigators used the information in the chat logs to identify the young teenagers that Anderson had relationships with. One relatively local victim, who used the name "Boxerboy" in the chats, was Dustin Williams from Jackson, Ohio. Officers identified the pornographic pictures that Boxerboy took of himself and sent to Anderson before he was 18. Officers identified Jay Johnson, Jason Ek and Brian Sidwell as young men whose pictures were found on Anderson's computers and whose names appeared in the chat logs.

The grand jury indicted Anderson. He pled not guilty to all the charges and had a jury trial.

The young men that the investigators identified in the chat logs testified at trial that their relationships with Anderson started when they were young teenagers. They described the gifts and money that Anderson provided them and how he paid them to go to his office and have sex. Their mothers testified about the time of their sons' relationships with Anderson and about the gifts and money their sons received from him. The state introduced into evidence numerous images of child pornography.

The jury found Anderson guilty of 108 criminal offenses and found him not guilty of 25 criminal offenses. The trial court sentenced him to a total of 75 years and four (4) months definite time and four years to 25 years indefinite time in prison with consecutive maximum sentences for the offenses where he had direct contact with the young men and where he actively participated in the creation of the child pornography.

4

*State v. Anderson*, 2004 WL 413273 (Ohio App. 4th Dist. March 2, 2004).  Represented by new

counsel, petitioner asserted the following assignments of error on appeal:

> I. The evidence presented at trial was insufficient to sustain Eugene Anderson's convictions for pandering obscenity involving a minor; pandering sexually oriented matter involving a minor; illegal use of a minor in nudity-oriented material; complicity in pandering sexually oriented matter involving a minor; complicity in illegal use of a minor in nudity-oriented material; promoting prostitution; and corruption of a minor, and the jury's verdicts were against the manifest weight of the evidence, thereby denying him due process of the law. Fourteenth Amendment, United States Constitution; Section 16, Article I, Ohio Constitution.

> II. The trial court erred by overruling Eugene Anderson's motion to dismiss Count 131, because the reproduction of a chat log is not a crime. Fourteenth Amendment, United States Constitution; Section 16, Article I, Ohio Constitution.

> III. The trial court erred by imposing maximum and consecutive sentences, and the aggregate sentence imposed was disproportionate to the seriousness of Eugene Anderson's conduct."

*See id.; Exhibit 8 to Return of Writ.*  On March 2, 2004, the appellate court affirmed the trial

court's judgment.  Still represented by counsel, petitioner filed a timely appeal.  He raised

the following assignments of error:

> 1.  Child pornography and sexual offenses against children do not suspend the Ohio and Federal Constitutions.  A defendant charged with such crimes needs the protection of the provisions of the constitutions as much as the defendant charged with a less disdainful offense.  Fifth and Fourteenth Amendments, United States Constitution; Section 16, Article I, Ohio Constitution.

5

2.  The reproduction of a chat log does not "show" a minor participating or engaging in sexual activity.  Unless an image is associated with the chat log, a defendant may not be convicted of pandering sexually oriented matter involving a minor.  Fifth and Fourteenth Amendments, United States Constitution.

3.  Imposition of a prison term that exceeds the life-expectancy of a defendant, who has been convicted on non-violent crimes, places an unnecessary burden on governmental resources in violation of R.C. 2929.13(A) and is a cruel and unusual punishment that violates the Eighth and Fourteenth Amendments to the United States Constitution.

*Exhibit 11 to Return of Writ.*  On July 13, 2004, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. *Exhibit 13 to Return of Writ.*  On December 9, 2004, the United States Supreme Court denied petitioner's petition for a *writ of certiorari.*  On August 16, 2004, petitioner filed a *pro se* delayed application to reopen his appeal pursuant to Ohio Appellate Rule 26(B).  *Exhibit 14 to Return of Writ.*  On September 1, 2004, the appellate court denied petitioner's application as untimely.  *Exhibit 15 to Return of Writ.*  Petitioner apparently never filed an appeal of the appellate court's decision to the Ohio Supreme Court.  On August 23, 2004, he filed *a pro se* petition for post conviction relief with the state trial court in which he asserted that his sentence violated *Blakely v. Washington*, 542 U.S. 296 (2004).  *Exhibit 18 to Return of Writ.*  On September 15, 2004, petitioner filed an amended petition for post conviction relief, additionally asserting that the statute of limitations had expired on count one, that his right to free speech had been violated, and that he was denied the effective

6

assistance of trial and appellate counsel.  *Exhibit 20 to Return of Writ*.  On July 17, 2006, the trial court denied petitioner's post conviction petition as untimely.  On March 27, 2007, the appellate court affirmed the trial court's judgment.  *State v. Anderson*, 2007 WL 949470 (Ohio App. 4th Dist. March 27, 2007).  On July 25, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal.  *State v. Anderson*, 114 Ohio St.3d 1481 (2007).

On December 2, 2005, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  The evidence presented at trial was insufficient to sustain the petitioner's convictions for pandering obscenity involving a minor; pandering sexually oriented matter involving a minor; illegal use of a minor in nudity oriented material; complicity in pandering sexually oriented matter involving a minor; complicity in illegal use of a minor in nudity oriented material; promoting prostitution; and corruption of a minor.
>
> 2.  The petitioner was denied his due process, notice, and trial by jury rights, as guaranteed by the Fifth and Sixth Amendments to the United States Constitution, when he was sentenced to non-minimum, maximum, and/or consecutive sentences based on facts found by the trial judge which were neither charged in an indictment nor found by a jury beyond a reasonable doubt.  (Blakely claim).
>
> 3.  The petitioner was denied due process of law when he was convicted and sentenced on count 1 of 01-CR-238, in that the statute of limitations had expired for the underlying offense prior to his being charged.
>
> 4.  The petitioner's right to free speech, guaranteed by the First Amendment of the United States Constitution, was violated

when he was convicted and sentenced for count 131 of 01-CR-218.

5.  The petitioner was denied effective assistance of trial counsel, in violation of the Sixth Amendment of the United States Constitution.

6.  The petitioner was denied effective assistance of appellate counsel, in violation of the Sixth Amendment of the United States Constitution.

It is the position of the respondent that petitioner's claims are procedurally defaulted or without merit.

## CLAIM ONE INSUFFICIENCY OF THE EVIDENCE

In claim one, petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions.  The state appellate court rejected this claim in relevant part as follows:

Counts 1-20 (Fuji Disk)

A.

In his first assignment of error, Anderson first contends that his conviction is not supported by sufficient evidence. Specifically, Anderson argues that in counts one through twenty he was charged with the reproduction ("copying") of ten images involving child pornography and possession of the same ten images that were found on a Fuji Disk CD. He maintains that the state did not produce any evidence showing that he copied those ten images onto the CD and/or that he viewed them. Anderson also claims that the state did not show that he had knowledge of the material as required under the statutes.

8

The Ohio Supreme Court has clearly outlined the role of an appellate court presented with a sufficiency of evidence argument. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. *See, also, Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. The elements of an offense may be established by direct evidence, circumstantial evidence or both. *See State v. Durr* (1991), 58 Ohio St.3d 86, 568 N.E.2d 674. Circumstantial and direct evidence are of equal probative value. *See Jenks* at 272, 574 N.E.2d 492 ("Circumstantial evidence and direct evidence inherently possess the same probative value [and] in some instances certain facts can only be established by circumstantial evidence.") When reviewing the value of circumstantial evidence, we note, "The weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." *Wesley v. The McAlpin Co.* (May 25, 1994), 1st Dist. No. C-930286, citing *Donaldson v. Northern Trading Co.* (1992), 82 Ohio App.3d 476, 483, 612 N.E.2d 754. *See, also, State v.. Coe* (2003), 153 Ohio App.3d 44, 2003-Ohio-2732 .

This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Rather, this test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U .S. at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. *State v. Thomas* (1982), 70 Ohio St.2d 79, 79-80, 434 N.E.2d 1356; *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

9

In counts one through twenty, the state charged Anderson with various violations of Ohio's child pornography statutes. R.C. 2907.321(A)(1), (3) & (5) provides: "No person, with knowledge of the character of the material or performance involved, shall * * * reproduce * * * any obscene material that has a minor as one of its participants or portrayed observers; [or] * * * produce * * * an obscene performance that has a minor as one of its participants; [or] * * * possess or control any obscene material, that has a minor as one of its participants[.]"

R.C. 2907.322(A)(1), (2), (3) & (5) provides: "No person, with knowledge of the character of the material or performance involved, shall * * * reproduce any material * * * [or] transport any material * * * [or] produce a performance * * * [or] possess * * * any material that shows a minor participating or engaging in sexual activity, masturbation, or bestiality[.]"

R.C. 2907.323(A)(1) provides: "No person shall * * * produce or transfer * * * any material or performance that shows the minor in a state of nudity * * * [or] possess or view any material or performance that shows a minor who is not the person's child or ward in a state of nudity[.]"

Here, contrary to Anderson's argument, the state produced substantial circumstantial evidence that Anderson did copy the ten separate images onto the Fuji disk CD, viewed those same ten images and had knowledge of the material.

The state first established that someone had to copy the images onto the CD, i.e. this type of CD would have been blank when new. The officers found the CD in Anderson's office in a stack of disks on his computer desk. The CD had other images on it, including the CZECH, CZSEX and BC series, which Anderson talked about in various chats.

In a chat, Anderson talked to Boxerboy about the BC series, which he said turned him on. He told Boxerboy that he was "missing BC054, 055, 057, and 075" but had the rest of BC01

10

through BC105. Specialist Jim Swauger testified that the same numbered images were missing from the BC series on the CD and that all the remaining images of the BC series were on the CD. Anderson also talked to Boxerboy about the CZECH and CZSEX series.

Agent Robert Setzer testified that he found a Paint Shop Pro browser file on the CD with the name of "anderson.er" in it, and Anderson's office computer had a hard drive with a volume label of "er.anderson." He said that this identifying evidence means that the file may have come from the hard drive of Anderson's office computer. Setzer further testified that Anderson's office computer had a Netscape program installed on it. The program showed that the computer had accessed newsgroups associated with child pornography, such as alt.binaries.pictures.erotica.teen.male, alt.binaries.pictures.boys, alt.binaries.pictures.erotica.teen.femal and alt.binaries.pictures.erotica.teen.femal. Anderson admitted to Sgt. Richard Meeks that he used a robotic arm to obtain pornographic images from newsgroups on the internet that he subscribed to. He said that he then looked at each captured image and deleted the ones that he did not want.

Sgt. Meeks testified that he found chats where Anderson gave _udeTodd advice on downloading pictures from newsgroups. He told _udeTodd how to download pictures and have only "pics" on the hard drive. "Pick all of the articles. Right click. And pick decode binary from popup menu." Anderson asked _udeTodd about alt.binaries.erotica.teen.male and said that he had a few "dad/son pics," which were "more taboo." Anderson said to _udeTodd, "Wait till you see my collection." During a later chat, Anderson discussed a third person with _udeTodd and said, "We found each other, looked at naked boy pictures on news servers." Anderson said that he just got the pictures "from alt.binaries.erotica.teen.male in the boys group." In January 1998, Anderson said that he had "5000 plus pics." In a chat with Ezzz in December 1999, Anderson said that he had 10,000 plus pics from alt.binaries.teen.erotica.male.

In a chat with chadchen on September 26, 2000, Anderson said that he had seen a lot of naked "pics" from the CZECH republic, and that he had "a couple of series of naked CZECH teens, eighteen plus at [his] office." He went on to say that he had a big server at his office that held about 150,000 pictures, and that he had been collecting pictures for years. He later told chadchen that he was transmitting from his office some pictures for him and said, "I had earlier uploaded them." Anderson told chadchen that he did not permanently keep "X-rated shit" on his Unix system at work. He said that he put it on that day so that he could download it that night.

The same images that were on the CD in question were also found on Caleb. Only Anderson and Sandford had root access to Caleb.

The state introduced more circumstantial evidence that Anderson had knowledge of the nature of the material. In one chat Anderson discussed the Mike series and said, "Some are of guys ten or so. I don't molest kids that age, just find their bodies attractive sometimes." In the Til_11m chats and pictures, Anderson solicited and received pictures of an 11-year-old boy on December 14, 2000. The Til_11m pictures were still on Anderson's office hard drive when the officers seized his computer on December 15, 2000. The Paul10yrld chat also shows that Anderson had a sexual interest in a 10 year old when he asked for, and apparently received, a picture.

In conclusion, after viewing the circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of each of the twenty crimes proven beyond a reasonable doubt, and specifically, that Anderson copied and possessed the ten images on the CD in question and that he did so with knowledge of the nature of the material. Hence, we find that the convictions in counts 1-20 are supported by sufficient evidence.

B.

Anderson also argues that the above twenty jury verdicts are against the manifest weight of the evidence and points to places in the record that support his defense version of the facts. Anderson points out that the earliest creation date for the CD was January 1996, which is right after Sandford came to work at Marietta College. Sandford talked about copying CDs in one of his chats and had access to Anderson's office because he knew the combination to the lock. Anderson points out that the labels on the CD did not match the labels found on the other CDs in his office. Anderson contends that his office computer might not have been able to read the CD because one of the state's experts testified that he could not read the duplicate CD sent to him for analysis.

Anderson further points out that the last creation date for the CD was January 1997, and he did not have a CD copier until August 1999. He states that his office computer's multimedia player history file showed that no files were viewed from the CD in question. He maintains that in all of his chats, he never talked of copying a CD with pictures on it or even mentioned a CD. He points out that the state's expert did not know who placed the images on the CD or know if he ever looked at, reviewed or accessed those ten images.

The state points to places in the record to support its version of what it maintains happened. The state's version has Anderson copying and possessing the ten images on the CD with knowledge of the nature of the material. The state agrees with Anderson that it did not have direct evidence to prove that he copied and possessed the CD with knowledge of the nature of the material. However, the state contends that the lack of direct evidence does not render its circumstantial evidence incredible or impossible because elements of a crime can be proven by circumstantial evidence, which has the same probative weight as any direct evidence. The state maintains that a forensic computer examiner will rarely, if ever, be able to find evidence actually placing a person at the keyboard committing crimes. The state further points to evidence in a January 1998 chat where Anderson talked to Boxerboy about copying images at least twice. The state claims that the record only shows that

13

Anderson said that he did not copy the CD, not that he never talked in all his chats about copying a CD with pictures on it or even mentioned a CD. Finally, the state points out that Anderson's office computer's media player history file would not show that he had viewed any of the images on the CD because still images would not be played on a media player.

***

Here, Anderson points to places in the record that support his defense version of the facts and the state does the same to support its version of the facts. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson copied and possessed the ten images on the CD with knowledge of the nature of the material. Hence, we find that the convictions in counts 1-20 are not against the manifest weight of the evidence.

Counts 127 and 128 (Jaz Disk 2)

A.

The grand jury indicted Anderson in count 127 with illegal use of minor in nudity-oriented material and in counts 128, 129 and 130 with pandering sexually oriented matter involving a minor. The jury found Anderson guilty of counts 127 and 128 and not guilty of counts 129 and 130. The offenses charged in counts 127 and 128 involve deleted images that the state recovered.

14

Anderson argues that the state did not produce sufficient evidence to support the convictions in counts 127 and 128. He contends that the state did not show that he created, produced, transferred and/or reproduced the images boyparty01.mpg and _bl.mpg, which were on the Jaz Disk 2.

The state did produce substantial circumstantial evidence to show that Anderson did copy the images onto the disk with knowledge of the nature of the material. Officers found this disk on a small, round, wooden stand in Anderson's office along with three other Jaz disks. Anderson had a shortcut icon on his desktop screen to a Jaz drive attached to his computer for use. Anderson chatted with _udeTodd in January 1998 about his Jaz drive and Jaz disks. The _udeTodd chats were found on the Jaz Disk 2. Agent Setzer found 790 log files or chats on Jaz Disk 2, which contained internet relay chat logs with Anderson's chat nicknames. One of the charged images with the name of boyparty01 was also listed on Anderson's office computer in his Windows Media player library. This evidence is important because both of the charged offenses in counts 127 and 128 were still images from movie files. The name boyparty01 helps to show that Anderson had knowledge of the nature of the material. Other images on Jaz Disk 2 appeared to have been produced in Anderson's office because of the same type of background.

After viewing the circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the two criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson copied the two images on the Jaz Disk 2 and that he did so with knowledge of the nature of the material. Hence, we find that sufficient evidence supported both convictions.

### B.

Anderson also argues that the two verdicts were against the manifest weight of the evidence. Anderson's version of the

facts has Sandford copying the two images onto the Jaz Disk 2 without Anderson's knowledge.

Anderson maintains that Sandford gave him the Jaz Disk 2 in November or December 1997. Anderson said that he used the disk to store his adult pornography. Anderson claims that he gave the disk back to Sandford in March 2000. Sandford then gave the disk back to Anderson in the summer of 2000. Anderson said that he did not know that the two charged images were on the disk when he got it back. Anderson admitted talking about a Jaz disk in some of his chats but said that he was referring to a different Jaz disk, not Jaz Disk 2.

Anderson points out that the officers did not find the disk inserted in his Jaz drive, that there is no direct evidence that he copied the two images, and that someone, not him, deleted all the images from the disk.

The state admits that it did not produce any direct evidence that Anderson copied the two images with knowledge of the nature of the material but instead relies on the same circumstantial evidence it outlined in it sufficiency of the evidence argument.

Here, Anderson points to places in the record that support his defense version of the facts and the state does the same to support its version of the facts. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these two counts. The jury sorted through the evidence and found Anderson not guilty of counts 129 and 130. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson copied the two images onto the Jaz Disk 2 with knowledge of the nature of the material. Hence, we find

that the two convictions are not against the manifest weight of the evidence.

Jaz Disk 3: Counts 22-68 (even numbered counts)

A.

The grand jury indicted Anderson in even numbered counts 22-68 for Pandering Sexually Oriented Matter Involving a Minor in violation of R.C. 2907.322(A)(5), except count 32 was for Pandering Obscenity Involving a Minor in violation of R.C. 2907.321(A)(5) and count 34 was for Illegal Use of a Minor in Nudity Oriented Material in violation of R.C. 2907.323(A)(3). These charges against Anderson involved the "possession" part of each of the statutes.

Anderson argues that insufficient evidence supported his convictions in the even numbered counts 24-68. The jury found him not guilty of count 22. Anderson contends that the state did not show that he "had knowledge of the character of the material or performance contained in the images on that disk."

Here, the state did produce substantial circumstantial evidence to show that Anderson did have knowledge of the character of the material on Jaz Disk 3. Officers found this disk with the other jaz disks on the small, round, wooden stand in Anderson's office with the notation "ERA, volume 2" written on it. Sgt. Meeks testified that the initials appeared similar to the initials Anderson placed on his *Miranda* rights waiver form. The deleted images on this disk comport with the information in the chats, i.e. Anderson said that he would not keep the "x-rated" material that he received that day on his computer permanently, but would download it that night. The deletions also comport with Agent Setzer's testimony about Jaz Disk 1, i.e. the jaz disks were used to backup hard drives. Anderson's office computer had path information that mapped it directly to the 40 GB hard drive on Caleb. Specialist Swauger found 19 (18 pictures and 1 chat) of the 23 offenses involving material

17

from the Jaz Disk 3 also on the 40 gigabyte hard drive on Caleb. In a chat with _udeTodd in January 1998, Anderson said, "I have a Jaz, one gigabyte." Anderson offered to bring one gigabyte of pictures to _udeTodd later that night. Later in the chat, Anderson told _udeTodd to bring his own removable Jaz disk.

After viewing this circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson had knowledge of the character of the material that he possessed on Jaz Disk 3. Hence, we find that the convictions in even numbered counts 24-68 are supported by sufficient evidence.

B.

Anderson also argues that the verdicts in even numbered counts 24-68 were against the manifest weight of the evidence. Anderson's version of the facts has Sandford deleting the material on Jaz Disk 3 and then giving Anderson the disk in the summer of 2000. Anderson says that he did view the disk, but it was blank.

Anderson maintains that the state did not prove beyond a reasonable doubt that he had knowledge of the nature of the material contained on the disk. He claims that the last access date for the pictures on the Jaz Disk 3 was April 28, 2000, and he did not get the disk until the summer of 2000. He says that there is no evidence that he possessed the disk before April 28, 2000. Agent Setzer testified that it was possible that the files were deleted before Anderson got the disk, and that it was possible that Sandford deleted the files on the disk. Anderson states that he was talking about a different Jaz Disk in his chats. He claims that he was talking about a disk on which he stored about 5,000 pictures of adult pornography. Setzer found only 2,789 pictures on Jaz Disk 3.

18

The state admits that it did not produce any direct evidence that Anderson had knowledge of the character of the images in Jaz Disk 3 that he possessed but instead relies on the same circumstantial evidence it outlined in its sufficiency of the evidence argument.

Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these counts. The jury sorted through the evidence and found Anderson not guilty of count 22 and not guilty of the odd numbered counts 22-68 (except 33) involving reproducing these same images. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson had knowledge of the character of the images found on the Jaz Disk 3 in his possession. Hence, we find that the convictions in even numbered counts 24-68 are not against the manifest weight of the evidence.

Counts 69-108, 188-201 (Caleb Complicity Counts)

A.

The grand jury indicted Anderson in counts 69-108 and 188-201 with Complicity in Pandering Sexually Oriented Matter Involving a Minor in violation of R.C. 2923.03(A)(2) and R.C. 2907.322(A)(1),(2),(3) & (5) and Complicity in Illegal Use of Minor in Nudity Oriented Material in violation of R.C. 2923.03(A)(2) and R .C. 2907.323(A)(1) & (3).

19

Anderson argues that insufficient evidence supports his convictions on these counts. He maintains that the state did not show that he "aided or abetted Robert Sandford in any way."

R.C. 2923.03(A)(2) provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" The offense in some of these counts is Pandering Sexually Oriented Matter Involving a Minor, and the offense in the remaining counts is Illegal Use of Minor in Nudity-Oriented Material.

Here, the state did show that Anderson aided and abetted Sandford in copying and possessing the images involving child pornography onto the 40-gigabyte and 8.4 gigabyte hard drives on Caleb. The images involving counts 69-108 and counts 188-201 were first found on the 8.4-gigabyte drive with exact images later found on the 40-gigabyte drive.

John Davis testified, and Anderson admitted at trial, that after Sandford left Marietta College and went to work at Ohio University, Anderson permitted Sandford to install and operate Caleb at Marietta College conditioned on Anderson's own "root" access. He worked with Sandford to collect pictures and knew about the images Sandford was harvesting and storing on Caleb. Several times Anderson discussed the Caleb collection as "pics" that he owned or possessed with Sandford. He referred to the Caleb server as a joint venture.

In a chat with Sandford on November 3, 2000, Anderson said, "I'm busy consolidating the pics we have." (Emphasis added.) Sandford was the internet manager at Marietta College before he left and went to Ohio University. In a chat with _udeTodd on January 18, 1998, Anderson said, "But I have a gay/bi Internet manager [i.e. Sandford] who is on my staff. He is twenty-eight. We found each other, looked at naked boy pictures on news servers. We both have Unix super user privs." (Emphasis added.) Caleb was a Unix server. In another chat with Sandford, Anderson asked him if he was going to put one of two 40 gigabyte disks into Caleb and then asked,

"What are we going to use the 40 megabyte [sic] for? I would like to dump all my pics there and use Samba; that way nothing is on my PC." (Emphasis added.) Sandford told him that was fine and, "[y]ou can use as much as you like." Anderson responded, "And of course, you can help yourself."

Sandford set up Anderson's account and gave him superuser access so that they both could have access to each other's pictures. Anderson ended up authorizing the purchase by Marietta College of a Maxtor Diamond 40 gigabyte hard drive for Sandford in exchange for some independent contracting work that Sandford was doing for the college.

Once when Anderson had trouble accessing Caleb, he told Sandford in a chat, "I put my year's worth of pics on that 40 gigabyte drive. I hope it isn't lost. We need to stabilize Caleb so it can be used." (Emphasis added.)

Specialist Swauger found that the child pornography images on the 8.4-gigabyte hard drive were attributable to Sandford because the directory information showed that Sandford was the user of the drive. The same images were under Anderson's home directory on the 40 gigabyte hard drive, which contained the robotic arm that the user set up to automatically go to user selected newsgroups and harvest binary information, i.e. all the picture and movie files. Anderson's office computer showed several binary newsgroups that he belonged to with some newsgroup names suggesting that child pornography images were included.

Instead of a robotic arm on the 8.4-gigabyte hard drive, Swauger found under "rsdandfor's" account two private web pages, which harvested newsgroup information indirectly by harvesting directly from the 40-gigabyte hard drive, instead of directly from newsgroups. One of the private web pages harvested child pornography images indirectly from seven different newsgroups. Hence, the circumstantial evidence the state produced showed that Sandford transferred the pictures involved in counts 69-108 and 188-201 to his 8.4-gigabyte hard

drive from Anderson's 40-gigabyte hard drive.

In a July 20, 2000 chat with Boxerboy, Anderson talked about hiding and moving pictures. He suggested that Boxerboy "zip" the images and FTP "them to our safe Linux server here." (Emphasis added.) In the same chat, Anderson offered to let Boxerboy "scan my 130K pics."

Swauger extracted a total of 273,463 pictures on the Caleb 40 gigabyte hard drive. Using a random sample procedure, Swauger estimated that 46,894 of the total pictures were child pornography, i.e. 14 year old or younger, and 32,796 of the total pictures were questionable child pornography, i.e. between the ages of 14 and 18. Swauger found 14,202 pictures on the 8.4 gigabyte hard drive of which 6,001 were estimated pictures of child pornography up to age 14 and 600 were questionable child pornography of children ages 14 to 18.

Swauger testified that Anderson and Sandford used the superuser or root password that allowed them complete and unrestricted use of all the hard drives on Caleb, including access into any private directories. The chats corroborate that Anderson wanted the ability to navigate the entire system.

After viewing this circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the criminal offenses proven beyond a reasonable doubt, and specifically, that Anderson aided and abetted Sandford in reproducing and possessing the images in issue with knowledge of the character of the material that Sandford reproduced or possessed on Caleb. Hence, we find that sufficient evidence supports the convictions in counts 69-108 and 188-201.

B.

Anderson also argues that the verdicts in counts 69-108 and

22

188-201 were against the manifest weight of the evidence. Anderson's version of the facts has Sandford accessing the 40-gigabyte hard drive and restricting Anderson's access to the files that Sandford created.

Anderson maintains that the state did not prove beyond a reasonable doubt that he aided and abetted Sandford. He claims that while that was a robot on the 40-gigabyte hard drive, there is no evidence that he knew about the robot or that he put the robot on the hard drive or that he wrote the program for the robot. He contends that Swauger could not classify any of the pictures found on the 40-gigabyte hard drive as child pornography. He maintains that his chats with others do not show that he helped Sandford move pictures from the 40-gigabyte hard drive to the 8.4-gigabyte hard drive.

Anderson says that Sandford owned Caleb, and he just had an account. He contends that Sandford installed the 40-gigabyte hard drive and transferred the pictures to his web page so that he could view the pictures, not Anderson. Sandford is the one that deleted and damaged the files, not Anderson. Swauger said that Sandford owned the robot, not Anderson, and that it is possible that Sandford owned all the pictures on the 40-gigabyte hard drive. The logs show that Sandford logged onto the entire system many more times than Anderson did. Finally, Anderson points out that he ordered the 40-gigabyte hard drive to put adult porn on, not child porn.

Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these counts. The jury sorted through the evidence and found Anderson guilty. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and

a new trial granted. The state introduced substantial circumstantial evidence to show that Anderson aided and abetted Sandford in reproducing and possessing the images with knowledge of the character of the material. Hence, we find that the convictions in counts 69-108 and 188-201 are not against the manifest weight of the evidence.

Promoting Prostitution-Five Counts

A.

The grand jury indicted Anderson in a separate case with five counts of knowingly transporting Jason Ek, Brian Sidwell and Jay Johnson acrossed (sic) the boundary of West Virginia and into Ohio in order to engage in sexual activity for hire in violation of R.C. 2907.22(A)(3). Two of the five counts involve allegations that Ek and Sidwell were minors at the time of the offense. The trial court consolidated this case with the prior case, and the same jury rendered verdicts in both cases.

Anderson argues that insufficient evidence supports his convictions on these counts. He maintains that the state did not show that he hired Ek, Sidwell and Johnson for sex and failed to show that any of them were minors.

R.C. 2907.22(A)(3) provides: "No person shall knowingly [t]ransport another, or cause another to be transported across the boundary of this state or of any county in this state, in order to facilitate the other person's engaging in sexual activity for hire[.]" A violation of this statute is a felony of the fourth degree, but if the person transported is a minor, then a violation of this statute is a felony of the third degree. Count 1 occurred in 1992 when it was a felony of the second degree.

Here, the state did show that Anderson hired Ek, Sidwell and Johnson for sex and did prove that on two of the occasions Ek and Sidwell were still minors. Anderson knew Ek when Ek

24

was around 14 years old. He would call or page Ek about every other day and Ek would leave with him. Ek's mother said that her son would return with expensive clothes and shoes that she did not buy for him. Ek said that he would go with Anderson to restaurants, stores, "his college" and his house. He said that Anderson bought him things and helped him get a pager. He said, "Sometimes [Anderson] would give me money; sometimes he wouldn't. I mean, it was like he would do me favors, and then it led up to like having sex later or I paid-you know, I paid him back or help him do like an odd job or something." Ek admitted that he met Anderson a few times each week for oral sex at Anderson's college office. He said that a couple of times Sandford was with them in the office while the sex acts were going on. He said that he did not remember his age when the sex started. He said that Anderson tried to coach him on what to say at trial and told him that the sex started when he was above the age of consent. Specifically, he told Ek that the sex started when Ek was seventeen.

Sidwell said that he met Anderson when he was "around ten or eleven years old" and started getting in the car with him when he was 13 or 14 years old. Anderson began to touch Sidwell's chest, stomach and underarms. Around age 15, Anderson told him "that he'd like to screw young boys in their behind A-S-S." Anderson would buy things for Sidwell and give him about $20 to $30 every other week. Anderson asked Sidwell if he would have sex with another man "in front of him so he could tape it and add it to his collection." He also asked him if he could touch his penis. Anderson showed him a picture of himself performing oral sex on a male and asked him if he would "like to make a little extra money"-$25 to $30. Later when Sidwell needed money, he agreed. He said that he was 15 or 16 when it first started. In a chat, Anderson told jey2 that he had been doing Sidwell since he was 16. Anderson encouraged Sidwell to not co-operate with authorities. Sidwell also identified an adult photo, which showed Anderson performing oral sex on him.

Johnson testified that he was an adult when Anderson took him to his college office and paid him to engage in sex.

Anderson admitted that the two had a sexual relationship, but denied paying him for sex. In Anderson's chats, he included Johnson in his list of his regulars or his "guys" with whom he performed fellatio. In general, Anderson admitted in his chats that he paid for sex.

Anderson told BadBoy_19 in a chat, "I never call it cost. Gift is better words and more legal. * * *. I usually help my guys out here to the tune of $30.00 to $50.00, but not always in cash, and not always as a quid pro quo." He told Taz420 why his payments and gifts were not prostitution, "I view it as a date. * * * Prostitution is more narrow, an agreed-upon sum up front, straight exchange for sex." He told VbDrum, "Well, I have paid some guys here to do it, much cheaper. Like $30.00 for a BJ." Anderson told mellowher when talking about muscular good-looking college boys, "There is one 19-year-old student at a nearby college I use. The rate seems to be $50.00 and a nice dinner, etc., with expectation of oral sex: Older blowing younger." He told Hang10, "I pay my guys $30.00 for a BJ, too."

After viewing this direct and circumstantial evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the five criminal offenses of promoting prostitution proven beyond a reasonable doubt, and specifically, that Anderson repeatedly transported Ek, Sidwell and Johnson from West Virginia to Ohio to engage in sexual activity for hire and that Ek and Sidwell were under the age of 18 when he first started bringing them to Ohio for sex. Hence, we find that the five convictions are supported by sufficient evidence.

### B.

Anderson also argues that his five criminal convictions for these five offenses were against the manifest weight of the evidence. Specifically, Anderson contends that the state did not prove beyond a reasonable doubt that he hired Ek, Sidwell and Johnson for sex and did not prove that Ek and Sidwell were

26

under the age of 18 when the sex started.

Anderson points out that Ek never testified that he paid him for sex and that Ek could not remember his age when the sex started. He states that the evidence shows that he was generous with Ek but that does not mean it was prostitution. He states that Sidwell could not remember his age when the sex started and no force was involved. Sidwell kept spending time with him, and it was Sidwell who called him for a ride or cigarettes. He said that Johnson only went to the authorities when he was in trouble with the law. While he had sex with Johnson when Johnson was an adult, he denied that he paid Johnson.

Here, Anderson points to places in the record that support his defense of the version of the facts and the state does the same to support its version. The jury heard both versions. It chose to believe the state's version and not believe Anderson's version for these five counts. The jury sorted through the evidence and found Anderson guilty of the five prostitution counts. We reviewed the record and are mindful that the jury was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. We cannot say, in resolving conflicts in the evidence, that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial granted. The state introduced substantial direct and circumstantial evidence to show that Anderson transported Ek, Sidwell and Johnson from West Virginia to Ohio to engage in sexual activity with them for hire and that Ek and Sidwell were under the age of 18 when he first transported them to Ohio for sex. Hence, we find that the five convictions are not against the manifest weight of the evidence.

Accordingly, we overrule Anderson's first assignment of error.

*State v. Anderson, supra,* 2004 WL 413273.

27

The factual findings of the state appellate court are presumed to be correct.  28

U.S.C. 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the
> judgment of a State court, a determination of a factual issue
> made by a State court shall be presumed to be correct.  The
> applicant shall have the burden of rebutting the presumption
> of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court decision

contravened or unreasonably applied clearly established federal law or was based on an

unreasonable determination of the facts.  28 U.S.C. 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> State court proceeding.

*Id.*

> A state court's determination is contrary to federal law when
> the state court arrives at a conclusion opposite to that reached
> by the Supreme Court on a question of law or on
> indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13,

28

> 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner.  *Id*. at 413, 120 S.Ct. 1495.

*Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005).  Petitioner has failed to meet this standard here.

To the extent that petitioner asserts his convictions are against the manifest weight of the evidence, such claim is not appropriate for federal habeas corpus review.  The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle,* 703 F.2d 959, 969 (6th Cir. 1983).  In the context of a claim alleging a violation of due process, "sufficiency of the evidence refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses.  *Jackson,* 443 U.S. at 319; *Walker,* 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence – as opposed to one based upon insufficient evidence – requires the

appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, petitioner's claim that his convictions were against the manifest weight of the evidence cannot be considered by this Court.

Petitioner does assert that the evidence was constitutionally insufficient to sustain his convictions. Before a criminal defendant can be convicted consistent with the United States Constitution, there must be sufficient evidence to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra*, 443 U.S. at 319. To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992)(citing *Jackson*, at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilty." *Id.* (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume – even if it does not appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, at 326).

Petitioner makes all of the same arguments he presented to the state appellate court. Upon review of the record, this Court agrees that, when viewing all of the evidence in the

30

light most favorable to the prosecution, *Jackson v. Virginia, supra*, the evidence was constitutionally sufficient to sustain petitioner's convictions.  The state appellate court's decision is not unreasonable so as to justify federal habeas corpus relief. 28 U.S.C. §2254(d), (e); *Williams v. Taylor, supra.*

Claim one is without merit.

## CLAIMS TWO THROUGH SIX - PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) *(per curiam)*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state

procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id.*  Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id.*  Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.  *Id.*  Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.  *Id.*  This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level.  *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In clam three, petitioner asserts that he was improperly convicted on count one because the statute of limitations had expired.  In claim four, petitioner asserts he was denied his right to freedom of speech by his conviction on count 131 of 01-CR-218.  In claim five, petitioner asserts that he was denied the effective assistance of trial counsel.  All of the foregoing claims should have been raised on direct appeal, where petitioner was represented by new counsel, but were not.  Further, petitioner may now no longer present such claims to the state courts under Ohio's doctrine of *res judicata. See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967).  The state courts were never given the opportunity to enforce the procedural rule

at issue due to the nature of petitioner's procedural default. Petitioner attempted to present these claims in his September 3, 2004, post conviction petition; however, the state appellate court affirmed the trial court's dismissal of petitioner's post conviction petition as untimely. This Court therefore deems the first and second parts of *Maupin* to have been met.

In claim two, petitioner asserts that his sentence violated *Blakely*. This claim, being readily apparent from the face of the record, also would properly be raised on direct appeal; however, petitioner was sentenced and the state appellate court affirmed his convictions and sentence prior to the United States Supreme Court's June 24, 2004, decision in *Blakely*. Petitioner filed his notice of appeal and memorandum in support of jurisdiction in the Ohio Supreme Court on April 16, 2004, also prior to *Blakely*. Further, petitioner argues that Ohio law did not permit him to amend his memorandum in support of jurisdiction before the Ohio Supreme Court to include a *Blakely* claim after the time that *Blakely* was decided. *See Memorandum in Response to Recommendations,* Doc. No. 31; Ohio Supreme Court Rule of Practice VIII, Section 7.[1] Petitioner thereafter first presented his

---

[1] Ohio Supreme Court Rule of Practice VII, Section 7 provides:

Corrections or additions to previously filed documents

A party who wishes to make corrections or additions to a previously filed document shall file a revised document and copies that completely incorporate the corrections or additions. The revised document shall be filed within the time permitted by these rules for filing the original document, except that corrections or additions shall not be made to a motion if a memorandum opposing the motion has already been filed.

*Blakely* claim to the state courts in his application to reopen the appeal pursuant to Ohio Appellate Rule 26(B); however, the state appellate court denied petitioner's application as untimely, *Exhibit 15 to Return of Writ*, and petitioner failed to file a timely appeal of the appellate court's decision to the Ohio Supreme Court.  Further, he may now no longer do so, as Ohio does not permit delayed appeals in Rule 26(B) proceedings.  Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(c).  Therefore, petitioner waived his *Blakely* claim as well as claim six, in which he asserts the ineffective assistance of appellate counsel. Again, the state courts were never given an opportunity to enforce the procedural rule due to the nature of petitioner's procedural default.

As discussed, petitioner attempted to present his *Blakely* claim to the state courts in an untimely post conviction petition; however, the state appellate court refused to address the merits of the claim because petitioner had not met the requirements for consideration of an untimely post conviction petition under O.R.C. §2953.23:

> Eugene Robert Anderson appeals the Washington County Common Pleas Court's dismissal of his petition for post-conviction relief for lack of jurisdiction. The crux of Anderson's argument is that the trial court erred when it dismissed his petition as untimely filed, because the United States Supreme Court recently created a new federal right exempting him from the 180-day-filing requirement contained in R.C. 2953.21. Namely, Anderson contends that the United States Supreme Court's decision in *Blakely v. Washington* (2004), 542 U.S. 296

---

Time permitted by these rules for filing any responsive document shall begin to run when the revised document is filed. The Clerk shall refuse to file a revised document that is not submitted in the form and within the deadlines prescribed by this rule.

34

created a new federal right entitling him to relief. Because we have already addressed this issue in *State v. Wilson,* Lawrence App. No. 05CA22, at ¶ 14, 2006-Ohio-2049, and found that *Blakely* did not create a new federal right, Anderson does not satisfy the first prong of the two-pronged test in R.C. 2953.23(A)(1), which creates an exception to the 180-day-time requirement for filing a post-conviction petition. Therefore, we find that the trial court did not err in finding that Anderson did not timely file his petition or demonstrate an exemption from the time requirement. Consequently, the trial court correctly determined that it lacked jurisdiction to consider the merits of Anderson's petition and dismissed it. Accordingly, we affirm the judgment of the trial court.

## I.

The trial court convicted Anderson in 2002, and sentenced him in early 2003. Anderson appealed. The transcript for an appeal to this court was filed on March 7, 2003. We affirmed the trial court's judgment in *State v. Anderson,* Washington App. No. 03CA3, 2004-Ohio-1033, appeal not allowed by *State v. Anderson,* 102 Ohio St.3d 1533, 2004-Ohio-3580, and certiorari denied on December 6, 2004, by *Anderson v. Ohio,* 543 U.S. 1027.

On September 3, 2004, Anderson filed his petition for post-conviction relief, alleging that the *Blakely* decision required the court to revisit its sentencing decision. On July 17, 2006, the court dismissed Anderson's petition because it lacked jurisdiction. The court found that he did not file the petition within the 180-day-time period as required by R.C. 2953.21(A)(2), and that he failed to show that any of the exceptions to the filing deadline set forth in R.C. 2953.23 applied. Specifically, the court found that " *Blakely* did not create a new right [when it was decided in 2004] because the Constitutional principal announced in *Blakely* was recognized and articulated in 2000 in *Apprendi v. New Jersey* (2000), 530 U.S. 466."

Anderson timely appeals, asserting that the trial court erred

35

when it found that *Blakely* did not create a new federal right.

II.

The crux of Anderson's contention is that the trial court erred when it dismissed his petition for post-conviction relief, because he failed to timely file it. He does not dispute that he failed to file his petition within the 180-day-time period prescribed by R.C. 2953.21(A). Instead, he argues that an exception contained in R.C. 2953.23(A)(1) excuses his late filing.

Pursuant to R.C. 2953.23(A)(1), a court may not entertain a delayed petition for post-conviction relief unless the petitioner satisfies a two-pronged test. First, the petitioner must show either: "that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in [R.C. 2953.21(A)(2) ] or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right." R.C. 2953.23(A)(1)(a). Second, the petitioner must show "by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense of which the petitioner was convicted * * *." R.C. 2953.23(A)(1)(b).

Thus, before a trial court may consider an untimely petition for post-conviction relief, the petitioner must prove: (1) that he was unavoidably prevented from discovering the facts upon which he bases his petition, or that the petitioner's claim is based upon a newly-created federal or state right, which is retroactive to his situation; and (2) that clear and convincing evidence demonstrates that no reasonable factfinder would have found him guilty in the absence of the alleged constitutional error. *State v.. Howell* (June 26, 2000), Meigs App. No. 99CA677.

36

This Court's standard of review is de novo when reviewing a trial court's dismissal or denial of a petition for post-conviction relief without a hearing. See, e.g., *State v. Barney,* Meigs App. No. 05CA11, 2006-Ohio-4676; *State v. Gibson,* Washington App. No. 05CA20, 2005-Ohio-5353. Thus, we will independently review the record, without deference to the trial court's decision, to determine if Anderson's petition satisfies the two-pronged test in R.C. 2953.23(A)(1).

Anderson contends that, under the grounds enunciated in *Blakely,* his sentence is contrary to law. He maintains that this case creates a new right that now applies retroactively to individuals in his situation. In *Blakely,* the Court held that the Sixth Amendment right to a jury trial prohibits the enhancement of a sentence based on factual findings made by the judge. *Blakely* at 301. However, we have already addressed this issue and found that *Blakely* did not create a new right, because it only applied the principles that were already established in *Apprendi, supra. Wilson, supra.*

Here, the trial court sentenced Anderson in 2003; after which he should have appealed any new right created by *Apprendi.* The new rights created by *Apprendi* were created prior to-not subsequent to-Anderson's sentencing. As such, Anderson's situation does not comport with the first prong of the two-pronged test set forth in R.C. 2953.23(A)(1) to except him from the requirement to timely file his petition for post-conviction relief. Specifically, Anderson did not show that the United States Supreme Court recognized a new federal right subsequent to the period of time prescribed in R.C. 2953.21(A)(2). Because Anderson must satisfy both prongs of R.C. 2953.23(A)(1) and he failed to satisfy the first prong, i.e. R.C. 2953.23(A)(1)(a), we do not need to address the second prong, i.e. R.C. 2953.23(A)(1)(b).

Therefore, for the above stated reasons, we find that the trial court lacked jurisdiction to entertain the petition and properly dismissed it. See *Wilson,* supra; *State v. Rawlins,* Scioto App. No. 05CA3021, 2006-Ohio-1901; *State v. Kelly,* Lucas App. No.

L-05-1237, 2006-Ohio-1399, at ¶ 12.

Accordingly, we overrule Anderson's argument that he satisfied the two-pronged test in R.C. 2953.23(A)(1) and affirm the judgment of the trial court.

*State v. Anderson, supra,* 2007 WL 949470. The Court deems the first and second parts of the *Maupin* test to have been met.

Petitioner argues that he reasonably promptly and fairly presented his *Blakely* claim to the state courts at the earliest opportunity he had to do so, *i.e.*, in his August 23, 2004, post conviction petition, and that this case is analogous to *Tanner v. Wolfe*, 2007 WL 649960 (S.D. Ohio February 23, 2007), and *Friley v. Wolfe*, 2007 WL 2007 WL 782156 (S.D. Ohio March 13, 2007)(granting habeas corpus relief on the merits of petitioners' *Blakely* claims). The Court is not persuaded by petitioner's argument.

Friley presented his *Blakely* claim to the state appellate court in a motion for reconsideration of his direct appeal; he then raised the issue in his appeal to the Ohio Supreme Court. Notably, the state appellate court rejected Friley's *Blakely* claim on the merits when it denied his motion for reconsideration. Thus, the procedural default of Friley's *Blakely* claim was not at issue. In *Tanner,* similar to the scenario herein, *Blakely* was decided after the petitioner's direct appeal had already concluded. Tanner therefore first presented his *Blakely* claim to the state courts in a successive petition for post conviction relief; however, the state appellate court, in rejecting the post conviction petition as untimely, misinterpreted the definition of "statutory maximum" set forth by the Supreme

Court in *Blakely. See Tanner, supra.* This Court therefore concluded that the state appellate

court had misapplied its own procedural rule barring consideration of the merits of the

Tanner's *Blakely* claim and addressed the merits of Tanner's *Blakely* claim. *See Tanner,*

*supra.* Neither such scenario is present in this case. While this Court does not agree

with the state appellate court's conclusion that petitioner should have known to raise the

*Blakely* issue under *Apprendi v. Washington*, 530 U.S. 466 (2000), as that case had been

interpreted prior to *Blakely, see Cvijetinovic v. Eberlin*, 2008 WL 918576 (N.D. Ohio March 31,

2008), citing *United States v. Burgess*, 142 Fed.Appx. 232, 240 (6th Cir. 2005)(unpublished);

*Nichols v. United States*, 501 F.3d 542 (6th Cir. 2007), *rehearing en banc granted, opinion vacated*

*January 3, 2008*,[2] and *United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002), the Court

---

[2] The United States District Court for the Northern District of Ohio in *Cvijetinovic
v. Eberlin, supra*, stated:

> In several different contexts, the Sixth Circuit has acknowledged that *Blakely*
> could not have been anticipated based on *Apprendi*. [FN14] First, in *United States
> v. Burgess*, 142 Fed. Appx. 232, 240 (6th Cir.2005) (unpublished), the Sixth
> Circuit held that failure to anticipate the rule in *Blakely* and raise it in the
> lower courts did not amount to ineffective assistance of counsel:

> FN14. The Sixth Circuit has recently vacated an opinion holding that counsel
> was ineffective because he did not argue, prior to *Blakely* but after *Apprendi*
> , that enhancements to a sentence based on judicial fact-finding but within
> the guidelines range violated the Sixth Amendment. *See Nichols v. United
> States*, 501 F.3d 542 (6th Cir.2007) *reh'g en banc granted, opinion vacated*, Jan. 3,
> 2008.

> Burgess's trial counsel cannot be deemed ineffective for failing to anticipate
> the Supreme Court's June 24, 2004 holding in *Blakely* that the Sixth
> Amendment precluded the imposition of a sentence ... based on facts not

nonetheless cannot conclude that the appellate court misapplied its own procedural rule restricting consideration of the merits of untimely post conviction statues under narrowly prescribed conditions by concluding that *Blakely* did not constitute a "new" rule within the meaning of O.R.C. 2953.23. Even if the state court incorrectly denied the post-conviction proceeding on that ground, petitioner was not without an avenue by which to raise a *Blakely* claim. In fact, he pursued a claim under *Blakely* in his August 16, 2004, delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B), but thereafter failed to appeal the appellate court's denial of his application as untimely to the Ohio Supreme Court. Because he may now no longer do so, Ohio Supreme Court Rule of Practice II, Section 2(A)(4)(c), and because the Ohio Supreme Court may have addressed the merits of petitioner's *Blakely* claim had he pursued a timely appeal, petitioner has waived the right to present his *Blakely* claim in these habeas corpus proceedings.

This Court must decide whether the procedural rules at issue constitute an adequate

---

found by a jury or admitted by the defendant.
*Burgess,* 142 Fed. Appx. at 240. The Sixth Circuit placed particular significance on the fact that the defendant in *Burgess* had never argued that he was sentenced above the statutory maximums.

\*\*\*

... [E]very Circuit Court believed *Apprendi permitted* judicial fact-finding within the guidelines range- *i.e.,* that *Apprendi* expressly sanctioned that practice. *See United States v. Leachman,* 309 F.3d 377 (6th Cir.2002).

and independent bases upon which to foreclose review of petitioner's federal constitutional claims. This task requires the Court to balance the state's interests behind each procedural rule against the federal interest in reviewing federal claims. *See Maupin v. Smith*, 785 F.2d at 138. Under this analysis, the procedural rules barring petitioner's claims constitute adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The requirement that all available claims be presented at the first opportunity and the time limitations for filing appeals and post conviction petitions serves the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Further, the doctrine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole*, *supra; State v. Ishmail, supra; State v. Perry, supra*. Again, regardless of whether the state court correctly applied its rule concerning untimely post-conviction proceedings, petitioner procedurally defaulted his *Blakely* claim when he did not appeal the denial of his Rule 26(B) motion to the Ohio Supreme Court, thus denying that court the opportunity to review the claim on its merits.

Petitioner has waived his right to present claims two through six for federal habeas corpus review. He can still secure review of his claims on the merits if he demonstrates cause for his failure to follow the state procedural rules as well as actual prejudice from the constitutional violations that he alleges.

As cause for his failure to file a timely appeal of the appellate court's denial of his

Rule 26(B) application to the Ohio Supreme Court, petitioner states that he was incarcerated in West Virginia without meaningful access to Ohio law, as well as his *pro se* indigent and incarcerated status. *See Traverse*, Doc. No. 9. Petitioner states that he did not know that he had the right to file an appeal of the appellate court's denial of his Rule 26(B) application to the Ohio Supreme Court. He received a copy of the Ohio Criminal Law Handbook in July 2004, but that reference included no case law or court rules. *See id.*

"[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir.2001), citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir.1999)(internal citation omitted).

> "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003); *see also Lundgren v. Mitchell*, 440 F.3d 754, 763-64 (6th Cir. 2006), citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Petitioner's *pro se* status, or "ignorance of the law and procedural requirements for filing a notice of appeal is insufficient to establish cause to excuse his procedural default." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir.2004), citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir.1995).

To establish cause, petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir.2007), citing *Jamison v. Collins*, 291 F.3d 380, 386 (6th Cir.2002) (holding that the

prosecution's withholding of *Brady* evidence qualified as a "substantial reason for the default that is external to [the petitioner]"). *See, e.g., Maples v. Stegall, supra,* 340 F.3d at 438-39 (failure by prison officials to promptly deliver legal mail may constitute cause for procedural default); *but see Martin v. Vannatta,* unpublished, 175 Fed.Appx. 45 (7th Cir. Mar. 23, 2006)(rejecting petitioner's assertion that inadequate funds for postage constituted cause for his untimely filing where he could have obtained free postage.)  The ineffective assistance of counsel may constitute cause for a procedural default.  *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), citing *Murray v. Carrier,* 477 U.S. 478, 488-89 (1986). However, the ineffective assistance of counsel cannot constitute cause for petitioner's procedural default in failing to file a timely notice of appeal with the Ohio Supreme Court, or in 26(B) proceedings, where petitioner had no right to counsel in those proceedings. *See Gulertekin v. Tinnelman-Cooper,* 340 F.3d 415, 425 (6th Cir.2003), citing *Coleman v. Thompson,* 501 U.S. 722, 752-53 (1991); *Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987)("[T]he right to counsel extends to the first appeal of right, and no further."); *Lopez v. Wilson,* 426 F.3d 339, 352 (6th Cir. 2005)(holding that 26(B) proceeding is collateral matter wherein the defendant does not have a right to counsel) (citations omitted).

Petitioner's arguments are not persuasive.  As discussed, his *pro se* incarcerated status, limited access to legal materials or the prison's law library, or his unfamiliarity with the Ohio Supreme Court's rules simply do not constitute cause for his failure to file a timely appeal.  *See Walker v. Timmerman-Cooper,* 2006 WL 3242101 (S.D. Ohio October 5, 2006), citing *Bonilla v. Hurley, supra,* 370 F.3d at 498.  Further, petitioner fails to explain why

43

he needed further access to Ohio case law to timely appeal to the Ohio Supreme Court and present arguments that had already been raised in the appellate court below.

Alternatively, petitioner contends that he fairly presented claim three, in which he asserts that his conviction on count 131 of 01-CR-218 violated the First Amendment, because the State, in its response to petitioner's appellate brief, referred to *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255-256 (2002)(striking provision of Child Pornography Prevention Act criminalizing possession of virtual child pornography created without using real children), and *State v. Dalton*, 153 Ohio App. 3d 286 (Ohio App. 10 Dist. July 17, 2003)(vacating defendant's guilty plea on pandering obscenity involving a minor under O.R.C. §2907.321 on charges involving defendant's private journal describing fantasies of the rape and torture of fictitious minor children). *See Traverse; Exhibit 9b Vol. I*, at 38-40. Again, petitioner's argument is not persuasive.

In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir. 1986). Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears self evident. *Haggins v. Warden*, 715 F.2d 1050, 1054 (6th Cir. 1983)(citing *Harless*, 459 U.S. at 6). Furthermore, "[a] petitioner 'fairly presents' his claim to the state courts by citing a

provision of the Constitution, federal decisions employing constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns." *Levine v. Torvik,* 986 F.2d 1506, 1515 (6th Cir. 1993)(citing *Franklin v. Rose*, 811 F.2s 322, 326 (6th Cir. 1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin*, 811 F.2d at 326; *Petrucelli v. Coombe*, 735 F.2d 684, 688 (6th Cir. 1984). Petitioner, however, need not "cite book and verse on the federal constitution." *Picard,* 404 U.S. at 277 (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1960)). The Sixth Circuit has strictly followed the requirement that petitioner fairly presented his federal constitutional claims to the state courts as a precondition to federal habeas review. *Weaver v. Foltz*, 888 F.2d 1097, 1098 (6th Cir. 1989).

Citing *Jackson v. Virginia, supra*, petitioner argued on direct appeal that the evidence was insufficient to sustain his conviction on count 131 and that his conviction violated due process because the State was permitted to delete the word "image" from the charge, and the chat log involved was a text file and not a photograph. Additionally, petitioner argued that his conviction on count 131 was improper because Paul 10 could have been an adult, and the chat occurred in West Virginia, not Ohio. Petitioner did not, however, refer to the First Amendment of the United States Constitution in support of this claim, nor did he argue that his conviction on count 131 violated his right to freedom of expression or refer to any federal or state cases relying on federal law which would have alerted the state courts to a First Amendment claim. *See Exhibits 8 and 12 to Return of Writ.*

The fact that the State referred to cases discussing the impact of the First

45

Amendment on criminalization of conduct that did not involve children or involved the defendant's possession of private fictional material in response to petitioner's claim does not mean that petitioner thereby fairly presented a federal First Amendment claim to the state courts. The Court further notes that the State referred to the foregoing cases in arguing that written material (not solely photographs) satisfied the requirements of the statute at issue, and in distinguishing the charge against petitioner as involving an actual, and not a purely fictitious, child. *See Exhibit 9b to Return of Writ.*

Petitioner failed to present a First Amendment claim to the state courts. Further, he has failed to establish cause and prejudice for such failure. His request to amend the petition to include here the same claim he raised on appeal, however, is **GRANTED**. Such claim is discussed, *infra.*

In short, petitioner has failed to establish cause for his procedural defaults, and this Court concludes that claims two through six are waived.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333. After review of the record, the Court does not deem this to be such a case.

## CLAIM FOUR

In claim four, petitioner asserts his conviction on count 131 denies him due process because that charge, as amended, failed to state a crime as it involved the reproduction of

46

written material (*i.e.*, a chat), and not reproduction of any image. The state appellate court

rejected this claim as follows:

> In his second assignment of error, Anderson contends that the trial court erred in not granting his motion to dismiss count 131 of the indictment. He maintains that the court should not have granted the state's request to amend count 131 because the amended count did not state a crime. Anderson does not show how he was prejudiced by the amendment. Instead, he maintains that the reproduction of a chat log, instead of an image, is not a crime.

> "Whether an amendment changes the name or identity of the crime charged is a matter of law." *State v. Cooper* (June 25, 1998), Ross App. No. 97CA2326, citing *State v. Jackson* (1992), 78 Ohio App.3d 479, 605 N.E.2d 426. Hence, our standard of review is de novo. *Nicholas v. Hanzel* (1996), 110 Ohio App.3d 591, 674 N.E.2d 1237.

> Crim.R. 7(D) provides in part: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."

> Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution entitles a person accused of a felony to an indictment setting forth the nature and cause of the offense. Crim.R. 7(D) governs the amendment of indictments and permits most amendments. However, when a trial court's amendment changes the name or identity of the offense charged, the trial court has committed reversible error, regardless of whether the defendant can show prejudice. *State v. Honeycutt,* Montgomery App. No.1900, *2002-Ohio-3490; State v. Strozier* (Oct .5, 1994), Montgomery App. No. 14021, quoting *State v. Headley* (1983), 6 Ohio St.3d 475, 478-479, 453 N.E.2d 716. When amendments do not change the name or identity of the offense charged, the defendant is entitled to a continuance "unless it clearly appears from the whole of the proceedings

that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made." *Strozier,* quoting Crim.R. 7(D).

Here, the state charged Anderson in count 131 with Pandering Sexually Oriented Matter Involving a Minor, in violation of R.C. 2907.322(A)(1),(2) & (3). The original indictment specified in count 131 that the offense involved a "_au110~1.log Image" while the amended count 131 deleted the word "Image" because the state said that the offense involved a chat, not an image.

We first find that amended count 131 still charges Anderson with Pandering Sexually Oriented Matter Involving a Minor. Hence, the name of the offense charged did not change.

We further find that the extension ".log" notified Anderson that he was charged with material that was a document. While the word "Image" also notified Anderson that an image was involved, the fact remains that he still was notified that a document was also involved. Deleting the word "Image" does not change the fact that he was notified that a document was involved. Hence, we find that the amendment also did not change the identity of the offense charged.

The state maintains that reproducing a chat log can violate R.C. 2907.322(A)(1), (2) & (3) because sexually oriented material can include a chat log. The state argued at trial that the chat involved Anderson asking a ten year old boy how he would like to engage in various forms of sexual activity or what types of sexual activity he had engaged in. Anderson saved and copied the chat eight times on different computer media, including on Jaz Disk 2 and the Caleb hard drives found here in Ohio.

The first part of R.C. 2907.322(A) states that "No person, with knowledge of the character of the *material* or performance involved shall do any of the following * * *." (Emphasis added.) R.C. 2907.01(J)(2) defines material to mean " *any* book, magazine, newspaper, pamphlet, poster, print, picture, figure, image, *description,* motion picture film, phonographic record,

48

or tape, *or* other tangible thing capable of arousing interest through sight, sound, or touch and includes an image or text appearing on a computer monitor, television screen, liquid crystal display, or similar display device or an image or text recorded on a computer hard disk, computer floppy disk, compact disk, magnetic tape, or similar data storage device." (Emphasis added.) Hence, we find by the plain language of the definition that sexually oriented material can include a description of a minor engaged in sexual activity. Consequently, we find that the trial court did not err when it granted the state's request to amend count 131 of the indictment because the amended indictment does allege a crime.

Accordingly, we overrule Anderson's second assignment of error.

*State v. Anderson, supra*, 2004 WL (Ohio App. 4th Dist. March 2, 2004).  Again, the findings of the state appellate court are presumed to be correct.  28 U.S.C. §2254(d), (e).  Petitioner has failed to establish that the state appellate court's decision is unreasonable so as to justify federal habeas corpus relief.  *See Williams v. Taylor, supra.*

Petitioner argues that reproduction of written material failed to charge a crime under state law.  This claim involves a matter of the state court's interpretation and definition of its own criminal statute and thereby fails to present an issue appropriate for federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws or treaties of the United States.  28 U.S.C. 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *Smith v. Sowders,* 848 F.2d 735, 738 (6th Cir.1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state

49

law or procedure. *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir.1988). " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir.1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Such are not the circumstances here.

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) day of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the

decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge